IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ERIC POOLE,                          *

    Plaintiff                    *

       v.                     *          Civil Action No. DKC-22-2233

R. RODERICK, *et al.*,               *

    Defendants                   *
               ***

**MEMORANDUM OPINION**

Defendants Asresahegn Getachew, M.D. and Adane Negussie, P.A. (together "Medical Defendants") filed a Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 18) in response to self-represented Plaintiff Eric Poole's civil rights complaint (ECF No. 8, amended complaint) on February 2, 2023.  Defendants Richard Roderick, Paul Wheeler, M. Thrasher, Lt. William Gillum, Christopher Wedlock, Thomas Sires, COII Meager, COII J. Wolford, and COII Bennet (collectively "Correctional Defendants") filed a Motion to Dismiss on April 25, 2023.  ECF No. 30.

Mr. Poole has opposed the motions filed by Defendants.  ECF No. 42.  In addition, Mr. Poole filed a Motion to Submit a Declaration (ECF No. 46) and a Motion to Supplement (ECF No. 50).  The matters pending before the court have been fully briefed; no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons that follow, the Medical Defendants' motion, construed as one for summary judgment, will be granted, the motion to dismiss filed by Correctional Defendants will be granted; and Mr. Poole's motions will be granted in part and denied in part.

I.      **Discussion**

    A.      **Medical Care Claims**

The facts regarding Mr. Poole's medical care are largely undisputed.  His claims concern treatment for chronic hip pain, which Mr. Poole asserts requires access to a stationary bike, gym equipment, and orthotic shoes with a one-quarter inch lift in the right shoe.  Medical Defendants seek dismissal or summary judgment in their favor and provide declarations and verified medical records to support their motion.  Mr. Poole had right hip replacement surgery in 2007 and, according to Dr. Getachew, "[t]ypically after hip replacement, the patient must engage in strenuous rehab for approximately six months" but it is not "medically necessary . . . over ten years after surgery."  ECF No. 18-3 at 5, ¶ 11.[1]  Notwithstanding Dr. Getachew's observation, efforts to address Mr. Poole's complaints of right hip pain have been extensive.  In addition to his chronic hip pain, Mr. Poole has hypertension.

When Mr. Poole arrived at Western Correctional Institution ("WCI") from North Branch Correctional Institution ("NBCI") in 2018, he was seen by NP Janette Clark for a physical exam. *Id*. at 6, ¶ 12, *see also* ECF No. 18-4 at 33-36.  Ms. Clark gave Mr. Poole a physical exam on November 11, 2018, and noted that he had undergone several hip surgeries dating back to his teens and early twenties.  *Id*.  Mr. Poole told Ms. Clark that he needed a medical order to use the stationary bike three times a week for his self-directed physical rehab.  *Id*.  Ms. Clark noted, however, that Mr. Poole was taught to do bicycle-type movements sitting down without using an actual bicycle.  *Id*.  Ms. Clark noted that he had no difficulty walking, sitting, or standing from a seated position.  *Id*.  At this time, Mr. Poole was wearing a shoe lift to address the discrepancy in

---

[1]      All page numbers cited refer to the page numbers assigned by the court's electronic docketing system.

leg length and Ms. Clark noted that a bone scan performed in October of 2017 showed nothing to suggest loosening or infection of Mr. Poole's prosthetic hip. *Id*. Mr. Poole had been prescribed Tramadol to manage his pain, but it was not intended for long-term use. *Id*.

Mr. Poole was seen by orthopedist Dr. Theodore Manson at University of Maryland Medical Center ("UMMC") on January 2, 2019. ECF No. 18-3 at 7, ¶ 14, *see also* ECF No. 18-5 at 108-10. Dr. Manson noted that a recent bone scan had not been performed and therefore ordered one because "[r]adiographs showed suspicion regarding loosening of the right femoral stem." *Id*. Dr. Manson also ordered outpatient physical therapy two to three times a week for eight weeks. *Id*.

Six months later Ms. Clark saw Mr. Poole and reviewed the notes from his visit with Dr. Manson. ECF No. 18-3 at 7, ¶ 15, *see also* ECF No. 18-4 at 44-46. Although Mr. Poole's right hip was tender, his gait was steady and smooth, and he did not exhibit any outward signs that he was in pain when getting on and off the examination table. *Id*. Ms. Clark "generated consultation requests for the bone scan, follow-up testing, and an x-ray of the right hip." *Id*., *see also* ECF No. 18-4 at 40-43; 47-48.

Dr. Bernard McQuillan saw Mr. Poole for chronic care on September 5, 2019. ECF No. 18-3 at 7, ¶ 16, *see also* ECF No. 18-4 at 52-53. Mr. Poole asked for a new shoe with a new shoe lift to address a one-quarter inch difference in the length of his legs. *Id*. Dr. McQuillan put in a consultation request for Mr. Poole to be seen by Ability Prosthetics and Orthotics (ECF No. 18-4 at 50-51), however, Dr. Getachew notes that the one-quarter inch difference "can be corrected with an off-the-shelf insert ordered from a catalog through the commissary." ECF No. 18-3 at 8.

Mr. Poole received a "nuclear medicine bone scan centered at the pelvis" on October 11, 2019. ECF No. 18-3 at 8, ¶ 19. The results of the scan showed "minimal asymmetric increased

activity in the region of the right greater trochanter and adjacent to the tip of the femoral stem component."[2]  ECF No. 18-5 at 111.

Mr. Poole returned to see Dr. Johnson at UMMC on October 23, 2019; however, the bone scan report did not arrive with Mr. Poole.  ECF No. 18-3 at 8, ¶ 20, *see also* ECF No. 18-5 at 112. Dr. Johnson noted that Mr. Poole's symptoms "were most consistent with lumbar neurologic claudication from stenosis."  *Id*.  The treatment plan for Mr. Poole was for him to use a stationary bike for 60 minutes three times per week, universal equipment for strengthening daily, and a one-fourth inch shoe lift on the right with orthopedic shoes.  *Id*.  Dr. Johnson also requested that a copy of the bone scan be sent to him, and that follow-up care be provided as needed for worsening symptoms.  *Id*., *see also* ECF No. 8 at 15.

On November 1, 2019, Mr. Poole submitted a sick call slip regarding the UMMC consult. ECF No. 8 at 16.  Mr. Poole was seen by Dr. McQuillan on November 6, 2019.  ECF No. 18-3 at 9, ¶ 22, *see also* ECF No. 18-4 at 69 -70.  At that time, Mr. Poole's blood pressure was 200/120. *Id*.  Dr. McQuillan ordered weekly blood pressure checks and a return visit in one month.  *Id*. Additionally, Dr. McQuillan ordered a 2400 calorie a day diet as requested by Mr. Poole and submitted a consultation request for physical therapy ("PT"), including "right lower extremity ("RLE") exercise program."  ECF No. 18-4 at 67 – 68, *see also* ECF No. 8 at 16.

PT Stephen D. Ryan ordered eight sessions of physical therapy with education for daily cell exercises on November 19, 2019.  Mr. Poole was educated on the use of the stationary bike and on what machines he should use for strengthening exercises.  The goal was to strengthen his right hip for which he underwent a total hip replacement in 2007.  ECF No. 8 at 16.  Mr. Ryan recommended eight sessions of PT for right hip strengthening.  After that, Mr. Poole would be

---

[2]    No explanation of this result is offered.

"released to self-management at the facility gym."  ECF No. 18-3 at 9, ¶ 23, *see also* ECF No. 18-4 at 73.

Mr. Poole was seen by Dr. Cedric Poku-Dankwah on December 11, 2019, who told him that his high blood pressure and his hip pain could be improved with diet and exercise.  ECF No. 8 at 16-17.  Mr. Poole told the doctor that he had yet to be allowed to use the gym for daily exercise and had not been approved for orthopedic shoes with a lift on the right.  *Id*.  Mr. Poole filed another sick call slip as well as an informal complaint with medical staff regarding these failures.  *Id*. at 17.  Mr. Poole then filed an Administrative Remedy Procedure complaint ("ARP"), number WCI-2293-19, complaining about the failure to provide recommended treatment, which was found meritorious.  *Id*.  The response stated:

> Your request for administrative remedy is meritorious.  On 10/23/2019 you were evaluated by the Neurologist.  It is noted that you did not have your CD for this appointment however your symptoms are most consistent with lumbar neurologic claudication from stenosis.  Therapy recommended at this time was as follows: stationary bike for 60 minutes three times per week, universal equipment for strengthening daily, shoe lift ¼ inch on right with orthopedic shoes, send CD of bone scan to me to review, follow up as needed for worsening symptoms.  On 11/6/19 you were evaluated by the provider.  Recommendations from the orthopedic specialist were reviewed at this time.  A consult was then placed for you to be evaluated by the physical therapist.  This was approved and on 11/19/19 this evaluation took place.  It was recommended at this time that you receive 8 sessions of physical therapy for right hip strengthening.  You were also educated on safe use of the exercise equipment and that you would be released to self management at the gym facility.  A review of EPHR shows that you have not yet been scheduled for physical therapy.  The onsite scheduler was contacted and you will be scheduled.  On 12/11/19 you were evaluated for chronic care.  At this time, a consult was placed for you to be evaluated for a shoe lift/orthopedic shoes.  Currently this is waiting on processing and approval.  The offsite scheduling department is currently working on obtaining a copy of your CD so that it may be sent to the orthopedic specialist as requested.  You will continue to be monitored through the sick call process.  Medical staff is to be reminded of the importance of following policies, procedures and orders thus ensuring adequate medical care is being provided.

ECF No. 8 at 17-18.  Mr. Poole relies on this response to support his contention that he continues to be entitled to access exercise equipment and a stationary bike.

Mr. Poole was seen by Dr. Michael Berger on January 4, 2020.  ECF No. 18-4 at 81-82. Dr. Berger noted that Mr. Poole had a discrepancy in the length of his right leg and that he was experiencing right hip pain and lower back pain caused by that discrepancy.  *Id*.  Dr. Berger also observed a "[c]ompensatory gait pattern" due to the one-quarter inch difference in the length of Mr. Poole's legs.  *Id*. at 82.  The assessment indicated that Mr. Poole "will need one-quarter lift to the right side" and that Mr. Poole should continue with PT.  *Id*.

Also in January of 2020, Mr. Poole spoke with Nurse Ryan Browning, who investigates and enforces meritorious remedies.  ECF No. 8 at 19.  Mr. Poole asked Mr. Browning why he had not yet been approved for a shoe lift and orthopedic shoes.  *Id*.  Mr. Browning told Mr. Poole that a three-person board approves or denies medical requests and the request for Mr. Poole's shoes and shoe lift was denied due to the length difference between his legs being only one-quarter inch. *Id*.  The board felt the length difference was bearable and did not need to be addressed with a lift. *Id*.

Mr. Poole then asked Lt. McFarland, HU #5 manager, if it was possible for him to give approval for Mr. Poole to purchase orthopedic shoes and a shoe lift "without medical having to foot the bill."  ECF No. 8 at 19-20.  Lt. McFarland had no objections but said Mr. Poole would need to let him know what was ordered and how it would be shipped as well as provide him with an email from medical staff stating that Mr. Poole has a medical need for the shoes.  *Id*. at 20. Pursuant to his conversation with Lt. McFarland, in January and February of 2020 Mr. Poole sent repeated request slips and informal complaints to medical regarding his willingness to buy his own orthopedic shoes and shoe lift.  *Id*.

Dr. Poku-Dankwah requested a consultation for eight sessions of PT for Mr. Poole on January 30, 2020.  ECF No. 18-3 at 10, ¶ 26, *see also* ECF No. 18-4 at 83-84.  Mr. Poole managed to complete seven PT sessions between February 13, 2020, and March 17, 2020.  ECF No. 18-4 at 87 -92, 94, 96 – 98.  According to Mr. Poole, he received eight sessions of physical therapy.  ECF No. 8 at 21.  Stephen D. Ryan, the physical therapist, told Mr. Poole that he would recommend orthopedic shoes and a shoe lift in his final report as something that would "accentuate the PT Self Manage."  *Id*.  Mr. Ryan also told Mr. Poole not to overdo the exercises and that if he felt any soreness or pain he should stop.  *Id*.  Soon thereafter, the gym was closed indefinitely due to the COVID 19 pandemic.  *Id*.  While the prison was on lockdown, Mr. Poole was limited to using daily cell exercises and believes that because he was not given the proper footwear his right hip pain worsened.  *Id*.  Additionally, Mr. Poole gained weight which, according to him, adversely affected his hypertension.  *Id*.

In April of 2020, Nurse Browning informed Mr. Poole that Lt. McFarland approved the purchase of orthotics and orthopedic shoes, but the "facility" was asking why Mr. Poole has to pay.  ECF No. 8 at 21-22.  Because of that inquiry, Mr. Poole was scheduled for another consultation with podiatrist Dr. Berger.  *Id*. at 22.  When Mr. Poole was seen by Dr. Berger later that month, Dr. Berger determined that Mr. Poole needed size 9 1/2 orthopedic shoes and a one-quarter inch shoe lift.  *Id*.  Dr. Berger also stated that if the request to purchase these items was denied by medical, Mr. Poole should be permitted to arrange for the purchase through his family.  *Id*.  According to Mr. Poole, Dr. Berger stated that the shoes and the lift were needed so that his chronic pain could be relieved.  *Id*.

Mr. Poole was removed from segregation and assigned to Housing Unit 2 at WCI on July 18, 2020.  ECF No. 8 at 22-23.  Mr. Poole filed an ARP because medical staff had not adhered

to the meritorious finding of WCI-2293-19 because they had not increased his medication, nor had he been approved for orthopedic shoes and a shoe lift. *Id*. Lt. Wagner interviewed Mr. Poole and asked how the ARP could be resolved. *Id*. at 23. Mr. Poole explained that his family was attempting to get the names of approved vendors to purchase the shoes and a lift but nobody would respond to their requests. *Id*. This led to a patient care conference held in August of 2020. *Id*. at 24. Lt. Wagner placed the ARP on hold and Mr. Poole was told that the gym would not be opened for anyone due to the pandemic and that he had falsely stated that the medical board disapproved the order for orthopedic shoes and a shoe lift. *Id*. Mr. Poole was sent to see Dr. Berger again. *Id*.

When Mr. Ryan saw Mr. Poole for PT recertification on August 6, 2020, Mr. Ryan reported that Mr. Poole was "doing well on his own," and noted no indication of pain when walking. ECF No. 18-4 at 107. Mr. Ryan noted that Mr. Poole was still waiting for a heel lift and corrective shoes but assessed his condition as improved and discharged him to self-management. *Id*.

A patient care conference was held on August 21, 2020. ECF No. 18-3 at 11, ¶ 27. The conference was scheduled at the request of correctional staff to review Mr. Poole's concerns about use of gym equipment. ECF No. 18-4 at 111 – 13. Additionally, Mr. Poole's request for "boots to wear in the winter" and a shoe lift were discussed. *Id*. Ms. Clark noted that Mr. Poole's shoe lift was "clearly worn" and reported that she had discussed the request for boots with correctional staff and had been advised that inmates are not normally given boots for the winter. ECF No. 18-3 at 11, ¶ 28. "Inmates are provided boots if they hold certain jobs in the institution that require wearing boots." *Id*. There was no indication that Mr. Poole needed boots to replace his "off the rack New Balance sneakers" he was currently wearing. *Id*.

With regard to Mr. Poole's request for a medical order to use gym equipment, his request was denied. ECF No. 18-3 at 11-12, ¶ 29. The reason the request was denied was that Mr. Poole

was assessed earlier that month and the therapist noted he was doing well; that Mr. Poole could use the gym when it was permitted by the institution; and that he could perform exercises on his own using the previously provided handouts for self-managed PT.  *Id*.  Mr. Poole did not agree with the plan.  *Id*.

Ms. Clark submitted a consultation request for Ability to evaluate Mr. Poole for a new shoe lift and orthopedic shoes.  ECF No. 18-3 at 12, ¶ 30, *see also* ECF No. 18-4 at 109-10.  The Utilization Management Medical Director ("UMMD") denied the request on August 25, 2020, because "medical necessity was not demonstrated."  *Id*. at 108.  The Director explained that a one-fourth inch shoe lift could be purchased and there was no requirement for specialized lifts.  *Id*.  On September 8, 2020, Dr. Getachew told Ms. Clark to inform Mr. Poole that the request for orthopedic shoes and a shoe lift had been denied.  ECF No. 18-3 at 12, ¶ 30.

Mr. Poole was seen by Dr. Berger on November 15, 2020.  During this consultation, Mr. Poole advised that "he was due to receive a shoe lift with shoes and boots to be ordered."  ECF No. 18-5 at 6.  Dr. Berger reviewed the notes and saw that "a previous consult was placed for shoe lift and boots/shoes."  *Id*.  Dr. Berger agreed with the "referral to orthotics to address his limb length discrepancy."  *Id*.  According to Mr. Poole, Dr. Berger seemed upset because his previous recommendations were not followed.  ECF No. 8 at 24.  He further claims that Dr. Berger added to his recommendation that Mr. Poole had daily pain from walking.  *Id*.

Mr. Poole saw Ms. Clark for chronic care on February 28, 2021.  Mr. Poole asked about his shoe lift and Ms. Clark told him that the UMMD denied the request.  ECF No. 18-3 at 13, ¶ 32, *see also* ECF No. 18-5 at 11-13.  Mr. Poole showed Ms. Clark an "off the shelf shoe lift that he purchased from a catalog" and said that "it did not reduce pain."  *Id*.  Ms. Clark noted that Mr. Poole was measured and fitted for a shoe lift in 2015, warranting a remeasurement since "length

could change over six years." *Id*.  Mr. Poole told Ms. Clark that he had ordered the boots that he had previously asked medical to purchase for him.  *Id*.  Ms. Clark put in a request for Dr. Getachew to see Mr. Poole via telemedicine.  *Id*.  According to Mr. Poole, his family was also not given authorization to pay for the shoes and insert.  ECF No. 8 at 24.

Mr. Poole claims that his weight gain and spike in blood pressure required him to receive blood pressure checks every morning for two weeks.  ECF No. 8 at 25.  During that time, his blood pressure did not level off nor did it decrease.  *Id*.  Mr. Poole continued to complain of pain, and he claims that he was doing daily stretches and workouts in his cell as instructed.  *Id*.  In Mr. Poole's view, his inability to use a stationary bike and gym equipment to work out placed him in danger of having a stroke and caused loss of muscle mass.  *Id*.

Mr. Poole sought help from Lt. Wagner with obtaining the prescribed shoes and shoe lift. ECF No. 8 at 25.  Lt. Wagner emailed Ms. Clark and Nursing Director Brenda Reese who told Lt. Wagner that medical was not going to pay for the shoes.  *Id*. at 25-26.  They further advised that Mr. Poole would have to "make do the best he can by utilizing the approved catalog vendors."  *Id*. at 26.

When Mr. Poole again wrote to the ARP Coordinator at WCI asking for the meritorious finding in WCI-2293-19 to be enforced, Lt. Wagner told Mr. Poole to leave medical alone and order from an approved vendor like they said to do.  ECF No. 8 at 26.  Lt. Wagner advised that if Mr. Poole did this and his pain was not relieved, then he would have proof that he had "tried their way."  *Id*.  Mr. Poole advised that he had already ordered two pair of "Pro Timberland boots and cushion pads from Union Supply that somewhat work."  *Id*.  Mr. Poole could not, however, find tennis shoes "that mimic the New Balance 990 Ortho shoes from the past that work well when exercising."  *Id*.

Dr. Getachew put in a request for an evaluation for a new shoe lift and orthopedic shoes on March 3, 2021, because Mr. Poole had reported that a shoe insert he had purchased off the shelf did not relieve his pain.  ECF No. 18-3 at 13, ¶ 33, *see also* ECF No. 18-5 at 15-16.  The request was denied by the UMMD with the explanation that "[b]ased on the information provided, medical necessity not demonstrated at this time.  Pain should be evaluated by function rather than subjective complaint."  ECF No. 18-5 at 15.  The suggestion was made that "off the shelf medical shoes and shoe inserts" should be considered.  *Id*.

Dr. Getachew saw Mr. Poole via telemedicine on October 7, 2021, with Nurse Karen Coleman assisting with the physical examination.  ECF No. 18-3 at 14, ¶ 35, *see also* ECF No. 18-5 at 36.  At this time, Mr. Poole was confined at NBCI after his June 8, 2021 transfer.  *Id*.  Mr. Poole reminded Dr. Getachew that "he was transferred to a facility where he used stationary bicycle and he wanted to know why he [was] back [at] NBCI."  *Id*.  Dr. Getachew told Mr. Poole that he had nothing to do with his transfer; rather, "his transfer was made by custody."  *Id*.  According to Mr. Poole, Dr. Getachew remembered the 2018 order requiring his access to a stationary bike and gym equipment and asked the nurse to call security to find out why he had been sent back to NBCI.  ECF No. 8 at 34.  Dr. Getachew states that he instructed Ms. Coleman to schedule Mr. Poole "to see [an] onsite provider for better evaluation and management of his chronic hip pain."  ECF No. 18-3 at 14, ¶ 35.

Dr. Howard Cook saw Mr. Poole for chronic care on October 22, 2021.  ECF No. 18-3 at 14, ¶ 36, *see also* ECF 18-5 at 38-40.  During this appointment, Mr. Poole told Dr. Cook that he was supposed to have access to a stationary bike and weights so that he could self-manage his physical therapy.  *Id*.  Mr. Poole also said that "the Commissioner and Dr. Getachew wanted him to have his rehab, and [he doesn't] understand why he was moved."  *Id*.  Dr. Cook observed that

Mr. Poole needed to understand that "physical therapy is not forever, and that he needs to learn the exercises and continue to do them on his own to maintain his range of motion." *Id*. Mr. Poole recalls telling Dr. Cook about his confinement to disciplinary segregation, that he was being asked every 60 days if he would accept a cell assignment, and that he had been transferred to NBCI in contravention to an agreed upon plan between "WCI Security and Medical Department." ECF No. 8 at 35. Mr. Poole was left with the impression that medical staff were "once again on board and that security through the report from Medical would alleviate the problem." *Id*.

When Mr. Poole saw Ms. Clark on November 28, 2021, he told her that "other providers had told him that he needed to be in a facility with proper rehab equipment" however, this was "not what was documented in the electronic health records." ECF No. 18-3 at 14, ¶ 37. Mr. Poole asked about a shoe insert and Ms. Clark told him that the March 3, 2021, request for consultation was not approved. *Id*.

Dr. Berger submitted another consultation request for Mr. Poole to be evaluated by Ability for a shoe lift with custom shoes on February 3, 2022. ECF No. 18-3 at 15, ¶ 38, *see also* ECF No. 18-5 at 63. Mr. Poole recalls that Dr. Berger was upset because his three prior requests for orthopedic shoes and a shoe lift had not been approved. ECF No. 8 at 39. Mr. Poole told Lt. Gillum about the problems he was having both verbally and in writing; however, the written report he tried to send was returned to him unopened. *Id*. at 40.

The request for orthopedic shoes and a lift was once again denied by the UMMD on March 8, 2022, for the same reasons provided in prior denials. ECF No. 18-3 at 15, ¶ 38.

Mr. Poole was seen by Physician's Assistant ("PA") Adane Negussie on April 6, 2022, for chronic right hip pain. ECF No. 18-3 at 15, ¶ 39, *see also* ECF No. 18-5 at 67-68. Mr. Poole again expressed his perception that he requires a stationary bike for his chronic hip pain. *Id*. At this

appointment Mr. Poole's medications were renewed and a request about the possibility of a transfer to a facility with access to a stationary bicycle was to be made by Mr. Negussie. *Id*.

After an April 13, 2022, telemedicine appointment with Dr. Getachew, Dr. Getachew ordered an x-ray of Mr. Poole's right hip to determine if there was evidence of femoral loosening. ECF No. 18-3 at 15-16, ¶ 40.

Dr. Getachew saw Mr. Poole at NBCI on April 19, 2022. ECF No. 18-3 at 16, ¶ 41. Upon exam, Dr. Getachew noted "mild atrophy of the muscles around the right hip where he had a surgical scar; otherwise, he had full muscle strength and could move his hip with no pain or difficulty." *Id*. The x-ray showed no abnormality and Mr. Poole walked without difficulty or pain. *Id*. When Mr. Poole expressed his desire to be transferred to WCI so he could use the stationary bike, Dr. Getachew noted that the transfer could not take place due to Mr. Poole's security status. *Id*. Dr. Getachew again explained that Mr. Poole could "do exercises to strengthen his hip muscles without using a stationary bicycle." *Id*. According to Mr. Poole, Dr. Getachew told him that Case Management had been notified about his need for a stationary bike and universal equipment. ECF No. 8 at 45. He also recalls that Dr. Getachew asked the nurse to "seek approval for shoes and lift." *Id*. at 46.

When Dr. Getachew saw Mr. Poole again on June 6, 2022, Mr. Poole again requested a transfer so that he could use a stationary bike and Dr. Getachew again explained that he could not order a transfer. ECF No. 18-3 at ¶ 42. Because Mr. Poole complained that his pain was exacerbated by sleeping on a thin mattress, Dr. Getachew asked the nurse to "contact custody to see if they would provide him with a mattress with more cushion." *Id*. Dr. Getachew prescribed Cymbalta to address the chronic pain; and hip exercises were sent to Mr. Poole. *Id*. Mr. Poole remembers that during this appointment, Dr. Getachew had instructed Nurse Lori to contact Case

Management to find out if Mr. Poole's family could purchase shoes and a shoe lift.  ECF No. 8 at 49.  Mr. Poole further claims that he heard Dr. Getachew tell Sgt. Crowe that Mr. Poole needs gym equipment and a stationary bike.  *Id*. at 50.

PA Negussie saw Mr. Poole on October 18, 2022, and noted that he had a medical history of being noncompliant with medications, hypertension, and chronic pain.  ECF No. 18-3 at 17, ¶ 43, *see also* ECF No. 18-5 at 96-97.  At this appointment, Mr. Poole stated that he was being transferred to another facility in two weeks and that he was expecting orthopedic shoes.  *Id*.  When PA Negussie saw Mr. Poole again on October 25, 2022, he asked if his family could order orthotic shoes for him and expressed his view that "he was taking too many blood pressure medications even though his blood pressure was uncontrolled and complained that his pain was not controlled with Cymbalta and Mobic."  *Id*. at ¶ 44.  According to PA Negussie, Mr. Poole was "irrationally irritable, loud, and threatening to sue."  *Id*.  Nevertheless, a treatment plan was developed which included:  adherence to medications, diet, and exercise; blood work; follow up appointments with the pain clinic; and a plan to schedule an evaluation with podiatry for an evaluation to get Mr. Poole's orthotic shoes.  *Id*.

## B.    Claims against Correctional Defendants

In addition to his allegation that Correctional Defendants knew about his medical needs but failed to intervene on his behalf, Mr. Poole alleges that his transfer to NBCI, deprivation of property, and disciplinary proceedings violated his constitutional rights.  Correctional Defendants maintain that the facts stated in the Amended Complaint, together with the exhibits attached to the original Complaint which Mr. Poole incorporated into his Amended Complaint (*see* ECF No. 8 at 1), as well as the exhibits attached to his Amended Complaint fail to state a claim and the Amended Complaint must be dismissed under Fed. R. Civ. P. 12(b)(6).  ECF No. 30.

14

Mr. Poole was transferred to NBCI from WCI on June 8, 2021.  ECF No. 8 at 26.  Mr. Poole states that on July 19, 2018, he had been transferred out of NBCI to WCI so that he could have access to a stationary bike.  *Id*.  Prior to leaving WCI, Mr. Poole approached Captain Jones and explained the reason he had been sent to WCI, but Captain Jones said it was out of his hands because someone who is an enemy to Mr. Poole was being sent to WCI.  *Id*. at 26-27.  Captain Jones further reassured Mr. Poole that Case Management would hold a hearing when he arrived at NBCI and that is when Mr. Poole could voice his concerns.  *Id*. at 27.

Upon arriving at NBCI, Mr. Poole expressed his "concerns about his fears of bodily harm, health and safety."  ECF No. 8 at 27.  Officer J. Wolford called Lt. Jeffrey Brewer and Lt. J. Bennett to the property room in response to Mr. Poole's stated concerns.  *Id*.  Mr. Poole explained that his fears were based on the fact that NBCI does not have a stationary bike or exercise equipment and asked to be placed on administrative segregation or protective custody.  *Id*.  Lt. Brewer and Lt. Bennett gave Mr. Poole a direct order to report to general population housing unit two, A-tier, cell 2.  *Id*.  Mr. Poole refused to report to the housing unit as instructed because "he would not be able to argue it's a known harm to be placed back in a facility that knowingly doesn't have the medical tools needed for the daily aspects of his prison life and if accepting placement [sic] he could not argue about it at a later date."  *Id*. at 27-28.

Because he refused a direct order, Mr. Poole was taken to lock-up where he encountered Officer Larry Gilpin who was the property officer for that housing unit.  ECF No. 8 at 28.  Mr. Poole states that initially Officer Gilpin did not want to deal with him but "was reminded to do his job" and then gave Mr. Poole an orange jumpsuit and a pair of deck tennis shoes.  *Id*.  Officer Gilpin also took Mr. Poole's boots with the shoe lift insert as well as his jeans and uniform blue shirt.  *Id*.

Mr. Poole reported to the property room on June 22, 2021, where he received two pair of boxers, three t-shirts, three pair of socks, two white towels, and one pillowcase.  ECF No. 8 at 29.  The remaining four boxes of Mr. Poole's property were placed in a secure area of the property room.  *Id*.  Mr. Poole refused to allow his property to be inventoried because of his belief that he would be transferred to another facility soon.  ECF No. 1-1 at 77.

Mr. Poole then attended his adjustment hearing with Hearing Officer Christopher Wedlock presiding over the hearing.  ECF No. 8 at 30.  Due to what Mr. Poole calls "countless run-ins" with Mr. Wedlock when he was a sergeant in charge of Housing Unit #3 from 2010 through 2017, Mr. Poole requested that Mr. Wedlock recuse himself.  *Id*.  The request for recusal was denied and, according to Mr. Poole, the hearing was one-sided with no evidence.  *Id*.  Mr. Poole was found guilty and given 30 days of segregation "on solitary confinement on the maximum/mental health tier."  *Id*.

While on segregation, Mr. Poole spoke with Megan Thrasher, Case Manager for disciplinary inmates, and told her about his medical situation as well as his "specific need of specialized exercise equipment for daily usage."  ECF No. 8 at 30.  He also explained to Ms. Thrasher that he had been transferred out of NBCI to WCI on July 19, 2018, due to the fact that NBCI did not have the equipment he needed.  *Id*. at 30-31.  Ms. Thrasher promised to check into the meritorious remedy issued in 2018 and then speak with her direct supervisor, Paul Wheeler.  *Id*. at 31.

After Mr. Poole's segregation sentence was completed, he was given another infraction because he would not voluntarily accept placement in Housing Unit 2.  ECF No. 8 at 31.  In Mr. Poole's view, he should have been placed on administrative segregation "pending a hearing before

[a] Case Management Team to troubleshoot and solve the placement in accordance to regulation[s] for medical need and safety concerns." *Id*.

Mr. Poole's June 22, 2021 adjustment hearing was again held before Mr. Wedlock. ECF No. 8 at 32. At the hearing, Mr. Poole claims that he was not allowed to call witnesses or introduce documents to establish that his placement in NBCI without access to what doctors had ordered, as evidenced by the meritorious response in WCI-2293-19, was improper. *Id*. The institutional representative, Sgt. Vanskiver, recommended 60 days segregation. *Id*. He explains that while on segregation, he was not allowed access to his boots and was required to "ambulate improperly" without orthopedic shoes or one-quarter inch shoe lifts. *Id*. at 33.

After receiving copies of his 2019 ARP that was found meritorious, Mr. Poole renewed his efforts to convince Case Manager Megan Thrasher, the NBCI Administrative Coordinator, Dr. Getachew, and Dr. Cook that his presence at NBCI violated specific orders for his medical care. ECF No. 8 at 36. After giving this information to Ms. Thrasher, Mr. Poole claims that she simply told him on a weekly basis that she had talked to Mr. Roderick and Mr. Wheeler and that there was no change in status for him. *Id*.

Mr. Poole became aware of regulation NBCI.ID.230.0004 on October 8, 2021, that requires inmates being transferred into NBCI to be placed on administrative segregation to allow for a Case Management Review Team to conduct a hearing to assess needs for the inmate's housing assignment. ECF No. 8 at 37. Two months later, Mr. Poole showed the directive to Ms. Thrasher, Captain Cabel, and Adjustment Hearing Officer Anderson, and all of them responded that someone had dropped the ball, but Mr. Poole was too late. *Id*. at 38. Mr. Poole was advised to bring the matter up at his next Adjustment Hearing. *Id*.

Mr. Poole received another disciplinary hearing before Mr. Wedlock on January 13, 2022. ECF No. 8 at 38.  When Mr. Poole attempted to have the directive introduced and to call as witnesses Lt. J. Brewer, Lt. J. Bennett, and Megan Thrasher, Mr. Wedlock denied all requests.  *Id*. Mr. Poole claims that Mr. Wedlock sentenced him to 60 days of segregation and revoked his phone privileges as retaliation for being summoned and deposed in other litigation Mr. Poole was involved in.  *Id*.  Mr. Poole recalls Mr. Wedlock stating that the regulation matter was a Case Management issue.  *Id*.  Mr. Poole appealed the guilty filing to the Inmate Grievance Office ("IGO"), raising a claim regarding the NBCI directive and alleging due process violations.  *Id*. at 39.

Mr. Poole was called to the main property room on February 18, 2022, by Captain George McAlpine and Lt. Sarah Miller for a property disposition hearing.  ECF No. 8 at 41.  This hearing was held at Lt. Miller's request because, in January of 2022, she saw that four boxes of property belonging to Mr. Poole were still in the main property room.  *Id*.  Lt. Miller had told Officer Bennett in November of 2021 not to hold the property anymore.  *Id*.  The result of the hearing was that the four boxes of property were to be inventoried and "allowable disciplinary segregation property" was to be issued to Mr. Poole.  *Id*.  The remaining property was to be boxed up and held in the Housing Unit #1 property room.  *Id*., *see also* ECF No. 1-1 at 80.

Mr. Poole's property was sorted by Officers Meager and Bennett.  ECF No. 8 at 42.  During this process, Mr. Poole noticed that some of his clothing that was allowable was being thrown away.  *Id*.  Mr. Poole's protests were ignored and when he was asked to "sign his name stating he approves of there [sic] actions," Mr. Poole refused.  *Id*.  Officer Meager then ordered Officer Troutman to escort Mr. Poole back to his housing unit without giving Mr. Poole any of his property.  *Id*.

Officer Eagleson brought two boxes of sorted property to Mr. Poole's cell and asked him to sign a receipt.  ECF No. 8 at 43.  Mr. Poole refused to sign the document because it would falsely indicate that he had witnessed the property being sorted and he did not know what was in the boxes and what was thrown away.  *Id*.  Officer Eagleson had Lt. Gillum come to Mr. Poole's cell door to try to convince him to sign the receipt, but Mr. Poole continued to refuse and asked for "another property disposition or to see Captain McAlpine and/or Lt. Sarah Miller."  *Id*. at 43-44.  Officer Eagleson and Lt. Gillum left taking the boxes of property with them.  *Id*. at 44.

On May 18, 2022, Mr. Poole was called to the property room where he met with Captain Sires, Officer Meager, Officer Bennett, and Officer J. Wolford.  ECF No. 8 at 46.  Captain Sires told Mr. Poole to "write any address down to send (4) boxes of property out."  *Id*.  Despite having reached what Mr. Poole believes was an agreement on the disposition of his property, the agreement was not enforced.  *Id*.  According to a June 28, 2022, response to Mr. Poole's ARP concerning the May 18, 2022, events, the property at issue was the property that Mr. Poole refused to accept when transferring into NBCI.  ECF No. 1-1 at 74.  The response further explains that Mr. Poole refused multiple attempts by NBCI Property Room officers to issue his personal property; that his request to have the property mailed to the Attorney General's Office was not an option; and that his request to have the property stored was not an option under NBCI policy.  *Id*.  After refusing all "allowable choices" Mr. Poole's complaint was found to be without merit.  *Id*.

Mr. Poole refused a strip search on July 27, 2022, for purposes of going out of the institution for a court trip.  ECF No. 8 at 51.  Mr. Poole based his refusal on his understanding that the settlement conference was going to be held at NBCI and not in court, and that he had not been provided his court clothes or his Timberland boots with an insert.  *Id*.  The transportation officer asked Officer Eagleson to look for Mr. Poole's court clothes and boots, but they could not be

located.  *Id*.  Shortly thereafter, Lt. Gillum came to Mr. Poole's cell and read a Matter of Record dated May 18, 2022, from Captain Sires.  ECF No. 8 at 52.  The document indicated that Mr. Poole had refused to send his property out to his family and had instead asked for it to be mailed to Assistant Attorney General Ryden.  *Id*.  After Mr. Poole was again given the choice to send his property to his lawyer and he refused, Captain Sires dismissed Mr. Poole and destroyed the four boxes of property which included Mr. Poole's court clothes and his Timberland boots.  *Id*.  In Mr. Poole's view, the destruction of his property was in violation of an agreement to hold his property while he was on disciplinary segregation and while his ARP was being processed.  *Id*.  After being transported to Jessup Correctional Institution, Mr. Poole was informed that the settlement conference was scheduled to take place remotely at NBCI.  *Id*. at 53.

Next, Mr. Poole states that he was denied access to the courts because the library did not have a CD/ROM, nor did it have LASI forms so he could request copies of cases.  ECF No. 8 at 54.  He states that the "State Court proceedings have been hampered to a successful claim."  *Id*.

## C.    Non-Dispositive Motions

Mr. Poole's first opposition did not directly address the Correctional Defendants' motion because he had not received it at the time he prepared that paper.  ECF No. 42 (signed, dated and placed in the mail on May 23, postmarked May 31, received and entered on docket June 1, 2023).  Mr. Poole then supplemented his opposition, which the court received on June 5, 2023, stating he received the Correctional Defendants' motion on May 30, 2023.  ECF No. 43.  Mr. Poole filed a Motion to Submit a Declaration, which was received in this court on June 12, 2023, and addresses the Correctional Defendants' motion.  ECF No. 46.  Mr. Poole also filed a Second Motion to Supplement, which this court received on June 29, 2023.  ECF No. 50.  This motion was filed after

counsel for the Medical Defendants filed a reply to Mr. Poole's opposition and supplements.  ECF No. 48.

Due to the delay in receiving the Correctional Defendants' Motion to Dismiss, this court will give Mr. Poole some leeway on allowing him to file additional materials following his receipt of the motion.  While it is reasonable to permit Mr. Poole to supplement his arguments regarding the Correctional Defendants' Motion to Dismiss, the same cannot be said about the motion filed by Medical Defendants.  Mr. Poole's Second Motion to Supplement is, in part, a surreply addressing the Reply filed by Medical Defendants.  No party is entitled to file a surreply unless otherwise ordered by the court.  *See* Local Rule 105.2(a) (D. Md. 2023).  A surreply is most often permitted when the moving party must respond to matters raised for the first time in a reply.  *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D. D.C. 2001).  The Medical Defendants do not raise any new matters in their reply.  Accordingly, to the extent that Mr. Poole's pending motions add to his responses addressing the Correctional Defendants' Motion to Dismiss, they are granted.  To the extent that the Second Motion to Supplement amounts to a surreply to the motion filed by the Medical Defendants, it is denied.

## II.    Standard of Review

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the Plaintiff's complaint.  *See Edwards v. Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999).  The Supreme Court articulated the proper framework for analysis:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (*abrogated on other grounds*).  While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.*; *Sanjuan v. American Board of Psychiatry and Neurology, Inc*., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more

> than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g.*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327(1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (footnotes omitted).

This standard does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *Id.* at 561.  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Id*. at 562.  The court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she

would have the burden of proof.  *Celotex*, 477 U.S. at 322-23.  Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. at 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id*. at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion."  *Matsushita Elec*. *Indus*. *Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment.  *See Anderson*, 477 U.S. at 252.

This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala*, 166 F. Supp. 2d 373, 375

(D. Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III.   Analysis

### A.   Eighth Amendment

Mr. Poole's Eighth Amendment claim centers on his medical care and concerns the treatment he believes he was denied by Medical Defendants.  Specifically, Mr. Poole claims that his condition requires his access to a stationary bike, exercise equipment, and orthopedic shoes with a right shoe lift.  In addition, Mr. Poole claims that the Correctional Defendants interfered with his need for access to a stationary bike and exercise equipment when they transferred him from WCI to NBCI.  He also claims that John Doe ARP Coordinators for WCI and NBCI failed to enforce the meritorious ARP WCI-2293-19.  ECF No. 8 at 5-6, *see also* ECF No. 8 at 17-18 (ARP Response).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious

medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.  Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  Proof of an objectively serious medical condition, however, does not end the inquiry.  The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *See Farmer v. Brennan*, 511 U.S. 825, 839, 40 (1994); *see also Anderson v. Kingsley*, 877 F.3d 539, 544 (4th Cir. 2017). Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial

evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk).

Mr. Poole argues that Dr. Getachew delegated a clinical decision regarding his care to Dr. Johnson, an orthopedic specialist.[3]  ECF No. 42 at 6-7.  Dr. Johnson's course of treatment, which included self-management on gym equipment after eight sessions of in-house physical therapy, was approved.  *Id*.  Mr. Poole disputes the Medical Defendants' claim that physical therapy was only for post-operational treatment and not to care for a permanent disability and states that this contradicts Dr. Johnson's assessment.  *Id*. at 8.  Mr. Poole adds that Dr. Getachew is not an

---

[3]     Mr. Poole cites COMAR 12.14.05.02.D.II.A.1 as the basis for Dr. Getachew's referral to Dr. Johnson.  ECF No. 42 at 6-7.  However, Chapter 5 of Title 12 governs "Minimum Standards for Adult Community Correctional Facilities" and simply provides that medical services will be provided and requires a regulation stating that security staff will not interfere in medical care unless it is necessary for the security of the institution.  COMAR 12.14.05.02 ("Standards – Inmate Safety").  The regulation does not affect the analysis of Mr. Poole's claim against the Medical or Correctional Defendants.

orthopedic specialist and therefore his opinion that resistance training is not needed is outside the scope of his expertise.  *Id*.

Mr. Poole relies in part on *LaFaut v. Smith*, 834 F.2d 389, 392-94 (4th Cir. 1987), for the proposition that a failure to provide rehabilitation therapy amounts to deliberate indifference.  *Id*.  The facts of that case differ significantly from the facts of this case.  The plaintiff in *LaFaut* was a paraplegic prisoner confined to a wheelchair who was denied access to handicap-accessible bathrooms and other accommodations both in his cell and at his work assignment for eight months.  *LaFaut*, 834 F.2d at 393.  The Fourth Circuit found that the "conditions under which [LaFaut] was confined . . . fell far short of meeting the 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .' embodied in the Eighth Amendment."  *Id*. at 394, quoting *Estelle*, 429 U.S. at 102.

Here, Mr. Poole's claim is based on a single consultation report from Dr. Johnson which Mr. Poole's relies on to advance his position that he is to have access to exercise equipment permanently:  a position the report does not support.  Further, Mr. Poole takes up this argument even though medical providers have repeatedly advised him that they cannot order his transfer to WCI and that he should be performing the exercises he was provided in his cell.  *See e.g.*, ECF No. 18-3 at 11-12.  Unlike the plaintiff in *LaFaut*, Mr. Poole has reasonable alternatives available to address his needs and has received the physical therapy ordered for him.  Further, the medical records submitted indicate that Mr. Poole's condition has improved without access to a stationary bike.  *See* ECF No. 18-4 at 107.  The advice repeatedly given to Mr. Poole represents a reasonable response in light of the risk involved.  There is no genuine dispute of material fact warranting further litigation of this claim against the Medical Defendants.

The claim that the Correctional Defendants denied him access to needed exercise equipment by transferring him away from WCI fails to state an Eighth Amendment claim as to the Correctional Defendants.  Mr. Poole acknowledges that his transfer from WCI was due to an enemy being moved from NBCI to WCI.  ECF No. 8 at 26-27.  Further, in exhibits submitted by Mr. Poole with his original complaint, an alternate plan for performing the exercises provided during physical therapy was developed and given to him.  ECF No. 1-1 at 57-65.  The Correctional Defendants are entitled to rely on the judgment of medical professionals in determining the appropriate treatment for inmates.  After consulting medical staff, it cannot be said that the Correctional Defendants had actual knowledge of a risk of harm to Mr. Poole.  *Young v. Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer [ ] should have recognized it.").  Thus the Amended Complaint fails to allege sufficient facts to state a claim that Mr. Poole's transfer was the result of deliberate indifference to a serious medical need.  Additionally, the claim that the John Doe ARP Coordinators did not enforce the meritorious finding in WCI-ARP-2293-19 presumes that Mr. Poole is entitled to access gym facilities with a stationary bike indefinitely.  The medical records do not support such a conclusion, nor does it appear that either of these John Does would have drawn such a conclusion but deliberately failed to enforce the finding.

Mr. Poole's claim regarding his need for orthopedic shoes and a lift in the right shoe is more problematic.  Medical Defendants admittedly have requested new orthopedic shoes and a shoe lift for Mr. Poole and each time the request has been denied, but the requests were not denied by any of the named defendants.  In any event, Dr. Getachew's medical opinion is that the one-quarter inch difference in leg length is not significant enough to cause chronic pain.  Assessments of Mr. Poole's gait vary from a "compensatory gait" to "smooth and even" with no evidence of

pain.  ECF No. 18-4 at 33-36, 44-46, 82, 107.  His request to buy his own orthotics was approved, ECF No. 8 at 21-22, and when he complained that they did not relieve his pain, he was again referred for fitting of orthotics with a specialist.  ECF No. 18-3 at 13, ¶ 33; ECF No. 18-5 at 15-16.  The referral was denied because the pain reported was subjective only.  *Id*.  The Medical Defendants have made multiple attempts to address Mr. Poole's stated need for orthopedic shoes and a lift despite very little evidence that the one-quarter inch length difference is the cause of any of his pain.  Mr. Poole's disagreement with a medical assessment that the shoes and lift are not needed to address a serious medical need is not a basis for an Eighth Amendment claim.  The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*."  *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977)).  The Medical Defendants are entitled to summary judgment in their favor on this claim.

### B.    Due Process

Mr. Poole's claims that his right to due process was violated center on his transfer from WCI to NBCI; the loss of his property; and the disciplinary proceedings that he was subjected to for refusing a housing assignment at NBCI.  Each of these claims concern actions or the failure to act by the Correctional Defendants and are therefore examined pursuant to Fed. R. Civ. P. 12(b)(6).

### 1.    Transfer from WCI to NBCI

The crux of Mr. Poole's claim regarding his transfer is that he was not given a hearing after he arrived at NBCI, in violation of the Case Management Manual OPS.100.0002§7A1[4] which provides that "[a]n inmate shall be classified to the least restrictive security level consistent with

---

[4]    Available at http://itcd.dpscs.state.md.us>pia (last viewed July 27, 2023).

the inmate's needs, public safety, and the safe and orderly operation of the facility."  Additionally, Mr. Poole claims that he was entitled to a hearing upon his arrival at NBCI to determine his needs and where he should be housed based on those needs.  Based on these allegations, Mr. Poole claims that John Doe[5] Housing Unit #1 Managing Official at NBCI, along with the other Correctional Defendants, violated his right to due process.

To the extent that a regulation or directive was violated, that alone does not amount to a violation of due process.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*).  It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison verses another, and absent a showing of significant hardship, a transfer to a different prison does not give rise to a right to notice and a hearing.  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."  *Meachum v. Fano*, 427 U.S. 215, 224 (1976).  Prisoners have a liberty interest in avoiding confinement conditions that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Wolff v. McDonnell*, 418 U.S. 539); *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005)).  Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for

---

[5]     Mr. Poole also alleges that "John Doe WCI's CMM for General Population" failed to follow regulations. ECF No. 8 at 6.  He does not, however, explain how this alleged failure impacted his protected constitutional rights.  Any claim against this John Doe must therefore be dismissed.

determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . . requires case by case, fact by fact consideration." (alteration in original) (internal quotation marks omitted)). "*Wilkinson* does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection." *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015). Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . harsh and atypical conditions" for Due Process protections to apply. *Id.* (emphasis in original) (citing *Wilkinson v. Austin*, 545 U.S. 209, 224-25 (2005)).

This claim centers on the alleged violation of an institutional directive that Mr. Poole claims requires case management staff to provide him with a hearing. *See* ECF No. 8 at 36 – 38. Even if this directive does require a hearing, it does not mean that the Fourteenth Amendment to the Constitution also requires it. Before constitutional due process protections apply, there must be a protected liberty or property interest at stake. Mr. Poole does not have a protected liberty interest regarding the prison where he is confined. The claim regarding the failure to provide Mr. Poole with a hearing upon arrival at NBCI is dismissed as to the Correctional Defendants and as to John Doe Housing Unit #1 Managing Official.

To the extent that Mr. Poole asserts that the Correctional Defendants have interfered with his medical care by transferring him to NBCI, the claim also fails. The Correctional Defendants relied on the affirmations provided by medical staff to discern whether Mr. Poole's stated need for access to the equipment was a legitimate medical need. In an ARP response dated June 7, 2022, Mr. Poole was advised that he had been evaluated by medical staff three times since April 6, 2022, and showed "no signs of distress or injury." ECF No. 1-1 at 24. Correctional staff were further

advised that Mr. Poole had been advised that he could do required exercises in his cell.  *Id*.

Accordingly, by Mr. Poole's own allegations, the Correctional Defendants were not aware of any

reason that he could not be safely housed at NBCI.  As such, this claim must be dismissed.

     2.     Property Loss

     In his opposition, Mr. Poole admits that he refused to comply with directives to provide an

address where his property could be sent because of his understanding that an agreement had been

reached whereby he could keep his property in storage while he remained on segregation.  ECF

No. 42 at 15-16.  Mr. Poole provides no evidence of this agreement; rather, he attaches as an exhibit

to his opposition a letter dated October 25, 2022, from the IGO dismissing his property claim as

wholly without merit.  ECF No. 42-23.  That letter provides:

> Your rights have not been violated.  I concur with the decisions of the Warden
> and the Commissioner, who fully addressed your complaint.  I note that staff on
> at least four occasions, either met with you or conducted a Property Disposition
> Hearing regarding your property.  I also note that on March 14, 2022, your
> property was approved for destruction, and at this point, it was more than 121
> days since your property had been confiscated.  Your property was finally
> destroyed and placed in the waste dumpster on May 17, 2022.  Policies and
> Procedures have been set in place and will be enforced by staff.

*Id*.  Thus, Mr. Poole received notice that his property would be destroyed.  Moreover, in the case

of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an

adequate post-deprivation remedy.  *See Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *overruled on

other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  The right to seek damages and

injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.  *See Juncker

v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[6]  The Supreme Court extended its *Parratt* holding

---

[6]    Although *Juncker* dealt with personal injury rather than property loss, its analysis and
conclusion that sufficient due process is afforded through post deprivation remedies available in
the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on
*Parratt* in dismissing plaintiff's due process claim.

to intentional deprivations of property. *See Hudson v. Palmer*, 468 U.S. 517, 533, (1984).
Therefore, even though Mr. Poole's personal property was destroyed, the claim does not amount
to a constitutional violation and must be dismissed for failure to state a claim. To the extent Mr.
Poole's property included materials related to his state litigation, the claim is analyzed below as a
First Amendment access to courts claim.

      3.     Disciplinary Proceedings

      Mr. Poole claims that his disciplinary hearings for the infractions he received at NBCI for
refusing housing were unfair because the hearing officer was biased and did not allow him to
introduce evidence or call witnesses. ECF No. 8 at 8, ¶ 12. Prisoners retain rights under the Due
Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution and the
full array of rights due a defendant in such proceedings does not apply. *See Wolff v. McDonnell*,
418 U.S. 539, 556 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)). In prison
disciplinary proceedings where an inmate faces the possible loss of diminution credits, he is
entitled to certain due process protections. These include: (1) advance written notice of the charges
against him; (2) a written statement of the evidence relied on and the reasons for taking any
disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present
evidence when doing so is not inconsistent with institutional safety and correctional concerns, and
a written decision; (4) the opportunity to have non-attorney representation when the inmate is
illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker.
*See Wolff*, 418 U.S. at 564-66, 592. There is no constitutional right to confront and cross-examine
witnesses or to retain and be appointed counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322
(1976); *Brown v. Braxton*, 373 F.3d 501, 504-05 (4th Cir. 2004). As long as the hearing officer's
decision contains a written statement of the evidence relied upon, due process is satisfied. *See*

*Baxter*, 425 U.S. at 322, n.5.  Moreover, substantive due process is satisfied if the disciplinary

hearing decision was based upon "some evidence."  *Superintendent, Mass. Corr. Inst. v. Hill*, 472

U.S. 445, 455 (1985); *Tyler v. Hooks*, 945 F.3d 159, 171 (4th Cir. 2019) ("the 'some evidence'

standard is extremely broad in scope and presents a very low burden for prison officials to meet."),

Federal courts do not review the correctness of a disciplinary hearing officer's findings of

fact.  *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980).  The findings will only be

disturbed when unsupported by any evidence, or when wholly arbitrary and capricious.  *See Hill*,

472 U.S. at 456; *see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990); *Tyler v. Hooks*, 945

F.3d at 171-72.  Further, a challenge to the validity of a prison disciplinary judgment may not be

raised in a § 1983 civil rights action where, as here, the judgment has not been overturned through

state procedures.  *Moskos v. Hardee*, 24 F.4th 289, 295 (4th Cir. 2022).

Mr. Poole's disciplinary proceedings have not been overturned.  Under Maryland law, the

guilty findings could be challenged through an appeal to the warden and a subsequent complaint

filed with the Inmate Grievance Office.  *See* Md. Code Regs. ("COMAR") 12.03.01.30(A) and

(C).  Mr. Poole does not allege his disciplinary charges have been overturned.  ECF No. 8 at 56.

This claim must be dismissed.

### C.    Access to Courts

Prisoners have a constitutionally protected right of access to the courts.  *See Bounds v.*

*Smith*, 430 U.S. 817, 821 (1977).  However,

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> litigating engines capable of filing everything from shareholder derivative actions
> to slip-and-fall claims.  The tools it requires to be provided are those that the
> inmates need in order to attack their sentences, directly or collaterally, and in order
> to challenge the conditions of their confinement.  Impairment of any other litigating
> capacity is simply one of the incidental (and perfectly constitutional) consequences
> of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349. Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Id*. at 399.

Mr. Poole offers as proof of an actual injury, an October 7, 2022, order from the Circuit Court for Baltimore City dismissing his application for leave to appeal after he failed to respond to an order to show cause. ECF No. 42-22. Mr. Poole does not explain what his application for leave to appeal concerned. Review of the dockets[7] in the case numbers listed, however, reveals that they are criminal convictions from 2002 which were closed on April 13, 2018, after Mr. Poole's appeal of the denial of post-conviction relief. *State of Md. v. Eric Von Poole*, Case Nos. 101192028, 031, 034, and 102114023 (Balt. City Cir. Ct. 2002)[8]. Without any evidence that Mr. Poole's loss of an opportunity to litigate his claim in State court was the loss of an opportunity to litigate a non-frivolous claim, his access to courts claim fails and must be dismissed.

---

[7]    Pursuant to Fed. R. Evid. 201(b), "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

[8]    Available at http://casesearch.courts.state.md.us/casesearch/ (last viewed Aug. 1, 2023).

**IV.    Conclusion**

For the reasons stated, the motion filed by the Medical Defendants, construed as one for summary judgment, will be granted; the motion to dismiss filed by the Correctional Defendants will be granted; Mr. Poole's motions will be granted in part and denied in part; and the Amended Complaint will be dismissed.

A separate Order follows.


August 15, 2023                                         /s/
                                    _____
                                    DEBORAH K. CHASANOW
                                    United States District Judge